**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **THOMAS A. GOGOE,** | : | |
| | : | |
| **Plaintiff,** | : | **Docket No.** |
| | : | |
| -   **against -** | : | |
| | : | |
| **AUSTIN LLOYD, INC.,** | : | **VERIFIED COMPLAINT** |
| **AUSTIN COINS, INC.,** | : | |
| **P. WHITE HOLDING, LLC,** | : | |
| **PATRICK WHITE,** | : | **Jury Trial Demanded** |
| **CHARISMA PERRY,** | : | |
| **ERIC LESAK a/k/a MIKE TODD,** | : | |
| **CHRISTOPHER PARADISE,** | : | |
| **and SEAN KLEIN,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

Plaintiff, Thomas A. Gogoe ("Gogoe" or "Plaintiff"), by his attorneys, The Law Offices of

Brandon Dei, PLLC, complaining of Defendants, Austin Lloyd, Inc. ("Austin Lloyd" or "ALI"),

Austin Coins, Inc ("Austin Coins or "AC"), P. White Holdings, LLC ("PWH"), Patrick White

("White"), Charisma Perry ("Perry" or "CP"), Erik Lesak a/k/a Mike Todd ("Todd" or "MT"),

Christopher Paradise ("Paradise"), and Sean Klein ("Klein" or "SK"), respectfully alleges:

<u>NATURE OF THE CASE</u>

**1.**      This action is brought pursuant to the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. §§ 1961-1968 (RICO), and New York law by Plaintiff Thomas Gogoe

against Patrick J. White (RICO Person), Charisma Perry (RICO Person), Mike Todd (RICO Person),

and Sean Klein (RICO Person) (collectively the "RICO Persons") operating by and through Austin

Lloyd, Inc. (RICO Enterprise), Austin Coins, Inc. (RICO Enterprise) and P. White Holdings, LLC

(RICO Enterprise) independently or as a RICO Association-In-Fact Enterprise, for their unlawful,

false, misleading and unconscionable misrepresentations and sales tactics that resulted in direct

damages to Plaintiff of approximately One Million Seven Hundred and Forty-One Thousand ($1,741,000.00), through a systematic pattern of fraud involving the purchase of precious metal coins that are not worth the value at which they were purchased and will never attain the value as claimed or return on investment as represented. Gogoe seeks restitution of his actual damages, plus consequential damages, punitive damages, pre- and post-judgment interest, attorneys' fees, litigation expenses and costs of suit.

2.       Upon information and belief, the RICO Persons, White, Perry, Todd, and Klein, conducted and/or participated in concert with the business and financial affairs of the RICO Enterprises, Austin Lloyd, Inc., Austin Coins, and P. White Holdings, LLC through an open-ended and/or closed pattern of racketeering activity as set forth herein. At all relevant times, the RICO Persons' wrongful actions were committed willfully, maliciously, with intent to injure and damage Gogoe, and with reckless disregard of his legal rights. The Defendants' relationship with Gogoe does not represent a one-off transaction but rather were representative of and were part and parcel of the RICO Persons' normal pattern and scheme through which they have defrauded—and continue to defraud—hundreds of other unsuspecting consumers out of millions of dollars.

3.       Plaintiff seeks to rescind the coin sales Defendants wrongfully made to him and/or recovery of actual damages, consequential damages, exemplary damages, treble damages under 18 U.S.C. § 1964, pre- and post-judgment interest, attorneys' fees, litigation expenses, and costs of suit.

**JURISDICTION AND VENUE**

4.       This Court has original subject-matter jurisdiction over the RICO claims pursuant to 29 U.S C. §1331, 18 U.S.C. §1964, and 18 U.S.C. §§1961 et seq.

5.       This Court additionally has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff is a citizen of Michigan, and all Defendants are citizens of states other than North

Dakota and the amount in controversy exceeds $75,000 exclusive of interest and costs. In addition, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) as those claims are so related to the federal claims in this action that they form part of the same case or controversy.

6.     Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C § 1391(a) because at all relevant times at least one Defendant resided, was found, had agents, and/or conducted business in this District. Moreover, at all relevant times, Defendants sold the precious metal coins at issue to Gogoe while they were residing in the Eastern District of New York. A substantial part—if not all—of Defendants' wrongful acts and omissions occurred in this District.

**PARTIES**

7.     Plaintiff, Thomas A. Gogoe ("Gogoe"), is a citizen and resident of Mooreton, Michigan.

8.     Defendant Austin Lloyd, Inc. ("ALI") is a privately-held corporation organized under the laws of the State of New York with its principal place of business located in Suffolk County, New York.  It can be served through the New York Secretary of State.

9.     Defendant Austin Coins, Inc. ("AC") is a corporation organized and existing under the laws of the State of New York with an address for the transaction of business located at 48 South Service Road, Melville, New York 11747.

10.     Defendant P. White Holdings, LLC ("PWH") is a limited liability company organized under the laws of the State of New York with its principal place of business located in Suffolk County, New York.

11.     Defendant Patrick J. White ("White") is a New York citizen and resident of Suffolk County, New York with a last known residential address at 3 Sweet Hollow Road, Huntington, NY

3

11743-6530 and a business address at 1019 Fort Salonga Road, Suite 112, Northport, NY 11768.

 **12.** Defendant Charisma Perry ("Perry") is an individual residing in Suffolk County at 3 Sweet Hollow Road, Huntington, New York 11743.

 **13.** Defendant Eric Lesak a/k/a "Mike Todd" ("Lesak" or "Todd") is an individual residing in Nassau County at 3494 Clifton Boulevard, Wantagh, New York 11793.

 **14.** Defendant Christopher Paradise ("Paradise") is an individual residing in Suffolk County at 3 Bradford Place, Melville, New York 11747

 **15.** Defendant Sean Klein ("Klein") is an individual residing in Suffolk County at 60 Locust Lane, Northport, New York and a business address at 1019 Fort Salonga Road, Suite 112, Northport, NY 11768.

## **FACTS**

 **16.** Thomas A. Gogoe is an industrial-part engineer residing in Mooreton, Michigan. In February and March of 2022, Defendants cold-called Gogoe to offer to sell him Gold American Eagle bullion coins that Defendants claimed were valuable and underpriced. Over three transactions, Gogoe bought One-hundred and fifty-two (152), 2021 West Point Jennie Norris Signed $10 Gold Eagle coins. When all was said and done, the Defendants swindled Gogoe out of One Million Six Hundred Eighty-Five Thousand Dollars ($1,685,000.00).

 **17.** The Defendants run a sales and telemarketing operation for the purpose of selling collectible numismatic, semi-numismatic, and bullion coins directly to consumers over the telephone and via the internet. Defendants personally and through various employees/sales agents make thousands of intrastate and interstate telephonic sales calls per month and ship these coins by interstate mail and private interstate delivery services. Defendants, using various unscrupulous techniques that prey upon unsuspecting consumers with little or no knowledge of the intricacies and nuances of numismatics, "upsell" coins at grossly inflated prices and continue their sham until the customer runs out of money, tires of buying coins, or discovers the true value of the fraudulently

priced coins. Many times, the Defendants confuse the consumer through a series of exchanges of coins claiming larger profits with different coins or fail to properly account for coins shipped back to the Defendants claiming they never received the coins, or hold coins of the client "on account" claiming to utilize these assets for trade on other "special" coins or to place such assets in upcoming auctions that never occur then never return the funds or the coins.

18.      Defendant Sean Klein was an Austin Lloyd sales associate.

19.      Defendant "Mike Todd" is an alias for an individual who White hired to be a part of the sales team named Eric Lesak ("Lesak"). Lesak had started working for Austin Lloyd in the Northport office and then moved into New York City after Austin Lloyd opened offices there.

20.      Lesak, as a salesman, has a troublesome past regarding improper and illegal sales practices.

21.      Lesak was convicted of four counts of wire fraud related to securities transactions. See, United States v. Eric Lesak, 1:06-cr-408-01. Then he was convicted of conspiracy to commit securities fraud and two counts of securities fraud and ordered to forfeit roughly $8,500,000. See, United States v. Eric Lesak, 1:07-cr-396-01.

22.      Additionally, on or about November 8, 2018, Lesak was barred by the SEC from participating in any offerings of penny stocks for twenty-five years after defrauding more than 100 cold-called investors into buying more than $2,800,00 worth of shares in a penny stock without disclosing that he plead guilty to securities fraud or that his firm was being paid thousands of dollars each month to promote that particular stock. Lesak was ordered to disgorge at least $767,115 and pay a civil penalty of $184,767.

23.      Coin dealers using these various tactics have been prosecuted by the United States Department of Justice, the Federal Trade Commission, and various States' Attorneys General and States' Security commissions. A precious metal fraud investigation by the United States Senate

Special Committee on Aging conservatively estimated that more than "10,000 Americans have been victimized through these schemes, with losses around $300 million." That number has exponentially increased as revealed in recent government prosecutions of these practices.

24.    Using the nuances and complexity of numismatics and the precious metal coin industry generally, the Defendants practice a subterfuge upon naïve consumers, using the consumers' lack of knowledge against them. In this case, Defendants utilized and continue to utilize one or more of the following unlawful, false, misleading and unconscionable sales tactics which have been identified and prosecuted by various governmental entities as fraudulent as part of Defendants' daily on-going business model:

A.    Enticing customers with false advertising offering to sell precious metal bullion coins at cost or minimum markups, when they do not have sufficient inventory to cover the advertisement;

B.    Misrepresenting or enticing the customer to purchase coins with a "two-year return policy" at no risk to the customer but subsequently stating that all sales were final;

C.    Misrepresenting attributes of precious metal coins to move customers from bullion to the over-priced numismatic and semi-numismatic coins;

D.    Claiming that the coins were at low "discount" prices due to hardships related to the COVID pandemic when such claims were false and misleading;

E.    Claiming that the coins could be held for a short period and then go to auction where they would bring "huge gains";

F.    Enticing the customer to buy coins to be sold in a special auction wherein the customers would realize large profits and then subsequently claiming the auction was cancelled;

G.    Claiming that coins could be sold to one of Defendants' "elderly clients" for large profits when, in fact, such "elderly clients" were fictitious;

**H.**     Misleading customers to send coins back for trade with assurances that the customers would realize large profits, while Defendants possessed actual knowledge that such trades would, in fact, result in significant losses to the customers;

**I.**     Stalling customers with fraudulent alleged business interruptions such as auctions cancelling, third-party buyers backing out of sales due to alleged estate issues, accounting issues, banking issues, shipping issues, etc.;

**J.**     Confusing the customer by misstating previous representations on trades, returns, values, coins, and various other tactics in an effort to obfuscate the transactions and frustrate the tracking of the transactions;

**K.**     Switching coins on orders and justifying it by representing that the coins shipped were of "similar value" when they were not;

**L.**     Guaranteeing significant, immediate profits of 200-300% when such claims are knowingly false and intended to induce and pressure the customer to make a hasty purchasing decision;

**M.**     Advising customers to purchase "unique" bullion coins, when, in fact, there is nothing unique about the coins;

**N.**     Misleading customers to buy or trade for pre-1933 gold coins and representing that by making such purchases or trades the customer would avoid tax issues;

**O.**     Trading or holding-for-trade coins with the promise to sell at a profit, when such inducement was merely intended to stall the customer, obfuscate the transactions, and delay the return of the coins or the purchase price;

**P.**     Providing misleading investment advice by claiming that exchanging bullion for pre-1933 gold coins would provide tax advantages and better short term investment opportunities, when such trades in fact result in significant and immediate losses in value and recovery would take years, if ever;

7

**Q.**     Using grading and marketing to deceptively sell bullion at a premium as some type of "modern numismatics," even though there are very large populations of the high-grade coins and/or the "certification" is commonly duplicated with minor expense;

**R.**     Misrepresenting the market value of "certified coins" to prevent or delay customers from determining the actual market price of bullion coins;

**S.**     Claiming a volatile market based upon the spot price of gold yet selling bullion coins at such exorbitant and fraudulent prices to make "market price" nothing but a gimmick;

**T.**     Misrepresenting the value of numismatic coins;

**U.**     Claiming that the Defendants had shipped coins to the Plaintiff when, in fact, they did not ship all the coins purchased by Plaintiff but instead intentionally failed to ship the coins and claimed that customers were mistaken or lying when they inquired as to the missing coins;

**V.**     Pressuring the customer into believing the need to purchase at a purported substantial discount was "immediate" and that the customer had to "act right away" to achieve large profits or else lose a good deal;

**W.**     Misrepresenting that their coins were such a good deal that they were willing to use a "company credit line" to purchase the coins if the customer would cover that credit, while at all times knowing that no credit was involved, that the coins were worth much less than claimed, and that no credit would ever be needed;

**X.**     Misrepresenting to the customer that he had increased his investment by millions of dollars but never forwarding any sums to the customer;

**Y.**     Inducing customers to sign away valuable rights to prevent or discourage customers from pursuing legitimate legal remedies; and,

**Z.**     Various other acts and practices that may be uncovered during discovery.

25.     In February 2022, Defendants began working their scheme upon Gogoe, mainly through RICO persons Sean Klein and Mike Todd. During the initial phone conversations with Defendants, Gogoe admitted that he knew nothing about precious metals or numismatics. He stated that he was interested in investing in precious metals but, because cash flow was critical to his business, he could not tie up the funds except in short-term investments. Defendants assured Gogoe that he could make substantial profits by buying highly graded "modern graded bullion" coins and quickly placing them into auctions. Defendants represented that these "modern graded bullion" coins were of limited populations and highly sought-after. The Defendants further represented that if the coins did not sell at auction, the Defendants provided a two-year return policy, so Gogoe's investment would be safe. These statements made by Klein and Todd, and possibly others of the Defendants or their telemarketing employees/agents, were intentionally false and calculated to induce Gogoe to purchase coins from the Defendants despite his expressed concerns about cash flow.

26.     On or about February 25, 2022, Gogoe bought thirty-nine (39) - 2021 West Point Jennie Norris Signed $25 Gold Eagle T2 NGC MS70 for $56,000 [NEED INVOICE] based upon representations by the Defendants that Gogoe was getting a fantastic deal and that he would make substantial profits in an upcoming auction. In reality, and unbeknownst to Gogoe, the fair market value of these coins he purchased was only approximately $36,250, and the claims and representations of the Defendants were illusory and false.

27.     On or about February 28, 2022, Gogoe bought thirty-nine (39) - 2021 West Point Jennie Norris Signed $10 Gold Eagle T2 NGC MS70 for $390,000 based upon representations by the Defendants that Gogoe was getting a fantastic deal and that he would make substantial profits in an upcoming auction. In reality, and unbeknownst to Gogoe, the fair market value of these coins he purchased was only approximately $146,250, and the claims and representations of the Defendants were illusory and false. Defendants then began to systematically upsell Gogoe but telling him that in order

to resell the coins to a bigger investor, he needed a bigger lot of coins. These statements were false and intended by Defendants to string Gogoe along and wring more funds from him.

28.     On or about March 1, 2022, Gogoe bought an additional eighty (80), - 2021 West Point Jennie Norris Signed $10 Gold Eagle T2 NGC MS70, for $800,000 again based upon representations by the Defendants that Gogoe was getting a fantastic deal and that he would make substantial profits in an upcoming auction. In reality, and unbeknownst to Gogoe, the fair market value of these coins he purchased was only $300,000, and the claims and representations of the Defendants were illusory and false.

29.     On or about March 3, 2022, Gogoe purchased and additional thirty-three (33) - 2021 West Point Jennie Norris Signed $10 Gold Eagle T2 NGC MS70, for $495,000 again based upon representations by the Defendants that Gogoe was getting a fantastic deal and that he would make substantial profits in an upcoming auction. In reality, and unbeknownst to Gogoe, the fair market value of these coins he purchased was only $123,750, and the claims and representations of the Defendants were illusory and false.

30.     The Defendants informed Gogoe that they had a buyer for the coins that they had sold to Gogoe and that he would triple his money quickly. Through March and April 2022, the Defendants informed Gogoe that they were negotiating with an unknown buyer and waiting for the buyer of the coins to make decisions and fund the deal. At that point Defendants told Gogoe that the problem with the deal was that the buyer was a "big player" who did not want so few coins and that if only Gogoe would purchase additional coins he could *then* make substantial profits.

31.     During this same March through June 2022 timeframe, Defendants continued stalling Gogoe, claiming that unknown buyers were either tied up in other deals or that his portfolio of coins wasn't big enough for them.  However, after waiting a reasonable period of time and not receiving the promised wiring of funds for his coins, Gogoe repeatedly contacted the Defendants to discover that each subsequent deal fell through. Upon information and belief, Defendants simply and

intentionally fabricated all of the foregoing to justify the non-payment and stall and string Gogoe along.

**32.**     **Plaintiff Gogoe has several of these calls recorded and are readily authenticated and available to present to the Court**.

**33.**     In one recorded call Sean Klein and Mike Todd used a "good cop – bad cop" strategy to try to get a Gogoe to buy an additional twenty-eight gold coins. They told him they had a buyer who only dealt in large lots and Gogoe's holding needed to be bigger. Gogoe was crestfallen and exasperated. He again reiterated to Klein and Todd that they had told him this would be a profitable short-term flip, and that he needed cash for his business and couldn't buy any more coins. Klein responded by quipping, "Well you'd hate me if I didn't bring you the opportunity."

**34.**     It is patently obvious that the Defendants' goal from day one was to run a confidence scheme and rob Gogoe of his money. Defendants effectively induced Gogoe to "invest" a large portion of his money in over-priced coins. Defendants misled Gogoe and enticed his into believing the "West Point Jennie Norris'" were a suitable short-term investment, that he was getting "good deals," that the coins would retain (and actually exponentially increase) their value, and that the coins were unique, special, and/or rare. Defendants failed to advise or disclose to Gogoe that he was paying substantially more than the fair market price of the coins and incurring immediate and substantial losses with each transaction.

**35.**     During the course of their dealings, which involved three substantial transactions, Defendants convinced Gogoe to purchase coins in the amount of at least One Million Seven Hundred and Forty-One Thousand and 00/100 Dollars ($1,741,000.00).

**36.**     Ultimately in March 2022, Gogoe became suspicious and began demanding that Defendants fulfill their promises, still believing that those coins represented substantial value.

37.     Upon information and belief, Gogoe began to do internet research and determined that the value of the coins was substantially below the value he had been advised.

38.     Later, Gogoe learned that Defendant Austin Lloyd has transferred much of his assets, accounts, and other holdings to Defendant Austin Coins, a new company wholly owned by Defendant White.  This is an attempt by White to avoid liability for his actions and the actions of his employees and part of the larger scheme and plan of the RICO enterprise.

39.     As of the date of the filing of this complaint, Gogoe paid a total of One Million Seven Hundred Forty-One Thousand and 00/100 Dollars ($1,741,000.00) to Defendants for the coins at issue.  Those coins he does possess were appraised by a professional numismatist who has determined that, at the moment of sale to Gogoe, the coins had a collective fair market value of (approximately) Six Hundred Thousand and 00/100 Dollars ($600,000.00), which means that the Defendants have swindled and robbed Gogoe of at least One Million One Hundred Forty-Seven Thousand and 00/100 Dollars ($1,147,000.00).

40.     Defendants and their telemarketer employees and agents knowingly and intentionally utilized unlawful, false, misleading, and unconscionable high-pressure sales tactics to convince Gogoe to purchase the grossly overvalued coins.

41.     Based upon information and belief, the multiple, repeated sales of over-priced coins to Gogoe are neither isolated incidents nor are they unique to Gogoe. Using these same fraudulent tactics, these Defendants have sold multiple millions of dollars of over-priced coins to hundreds of other consumers since the scheme's inception in 2017 and continue to do so indicating a continuing open-ended pattern of criminal fraudulent conduct.  Published reports from the Better Business Bureau and Business Consumer Alliance indicate that in 2019 and 2021, other consumers were raising the same claims of fraud and illegitimacy described above against Defendants. Such companies do not stop without government intervention or overwhelming litigation.  To this day, the Defendants continue to operate their enterprise in the same fashion and utilizing the same

fraudulent, high-pressure sales techniques and schemes which poses a threat of continued criminal activity.

42.     On or about, February 2023, White established Defendant Austin Coins.   Upon information and belief White had begun diverting money from Austin Lloyd to Austin Coins in an attempt to hide profits and avoid liabilities.

43.     Upon information and belief White had been selling AL's inventory and then receiving the profits in Austin Coins. Upon information and belief all the funds used to incorporate Austin Coins came directly from AL's operating account.

44.     Upon information and belief, Perry has never been employed by AL and has never provided AL valuable services.  Therefore, there is no basis under which Perry would have ever received payments, distributions or funds from AL or any of its accounts.

45.     Upon information and belief, White would also divert funds to his girlfriend, Charisma Perry.  On or about June 19, 2020 White made a wire transfer in the amount of $20,000 to the "Etrade" account of Charisma Perry. Another identical transfer was made four days later.

46.     Upon information and belief, between January 2022 and February 2023, White transferred in excess of $800,000 to Perry from AL's operating account through her e-trade account or through Zelle or through other means unknown to Plaintiff.

47.     Upon information and belief, since AL first opened for business in 2017, White has fraudulently siphoned millions of dollars to Perry's accounts and Perry has accepted these funds despite having provided no consideration or valuable services to warrant the payments.

48.     Upon information that by reason of White fraudulent, illegal and improper transfer of AL's assets into the accounts of Perry, she has received no less than five million ($5,000,000) dollars despite have no good faith basis with which to receive said moneys.

49.     As a direct and/or proximate result of Defendants' above-described wrongful acts and practices, Gogoe suffered, and continues to suffer, substantial economic damages.

**CLAIMS FOR RELIEF / CAUSES OF ACTION**

<u>**COUNT I**</u>

**MAIL FRAUD AND WIRE FRAUD**
**A Pattern of Unlawful Activity Under 18 U.S.C. § 1961, et seq.**

50.     All the preceding factual statements and allegations are incorporated by reference and re-alleged as if fully set forth herein at length.

<u>**RICO PERSON Patrick White**</u>:

51.     Patrick White (RICO Person) conducted and/or participated in concert with the business and financial affairs of the RICO Enterprises Austin Lloyd, Inc., Austin Coins, Inc., and P. White Holdings, LLC , independently or as RICO Association-in-Fact Enterprises through a pattern of racketeering activity; to wit: Todd participated, directly and indirectly, with Todd, Perry, Klein and others, and together they acted with, by, and through various employees, representatives and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 that generated multiple and repeated fraudulent and unlawful coin sales to Gogoe and numerous other of Defendants' telemarketing customers that, in turn, generated exorbitant compensation for White. In association with Todd, Perry, and Klein, Todd caused ALI (RICO Enterprise), AC (RICO Enterprise) and PWH (RICO Enterprise), independently or in concert as RICO Association-in-Fact Enterprises, to use the interstate mails and wires to repeatedly make and/or send fraudulent coin solicitations, sales receipts, and/or other purchase confirmations to Gogoe and numerous other of Defendants' telemarketing customers.

52.     By his unlawful acts, Patrick White (i) conducted and/or participated in the affairs of ALI (RICO Enterprise), AC (RICO Enterprise) and PWH (RICO Enterprise), independently or in concert as RICO Association-in-Fact Enterprises, in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and (c) (in violation of 18 U.S.C. §1962(d)), and defrauded

Gogoe and numerous other of Defendants' telemarketing customers in the process. White committed these substantive RICO offenses by causing ALI (RICO Enterprise), AC (RICO Enterprise) and PWH (RICO Enterprise), independently or in concert as RICO Association-in-Fact Enterprises, to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself, Todd, Perry, Klein, and possibly others unknown at this time. White knew that making and/or sending fraudulent solicitations, sales receipts and/or purchase confirmations to Gogoe and other telemarketing customers was fraudulent, misleading, and unlawful. White knew such wrongful acts and practices would generate multiple and repeated unlawful coin sales to Gogoe and other telemarketing customers that, in turn, would generate exorbitant compensation for himself. White engaged in the scheme to take unfair advantage of Gogoe. White's wrongful acts proximately and/or directly caused Gogoe and numerous other Defendants' telemarketing customers to be substantially overcharged for the coins.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(c)

**53.**     All the preceding factual statements and allegations are incorporated by reference and re-alleged as if fully set forth herein at length.

**54.**     ALI, AC, and PWH are each an "enterprise" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d).

**55.**     Patrick J. White, Charisma Perry, Mike Todd, and Sean Klein are "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

**56.**     Patrick J. White, Charisma Perry, Mike Todd, and Sean Klein conducted and/or participated in the business and financial affairs of ALI (RICO Enterprise), AC (RICO Enterprise) and PWH (RICO Enterprise) through patterns of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud

15

and wire fraud, in violation of 18 U.S.C. §§ 1341; 1343, set forth above.

57.     The patterns of unlawful activity and corresponding violations of 18 U.S.C. § 1962(c) (*see* ¶¶ 15-36, *supra*) by, Patrick J. White, Charisma Perry, Mike Todd, and Sean Klein proximately and/or directly caused Gogoe to suffer injury to his business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit, Gogoe was damaged by, inter alia, the fraudulent and grossly inflated prices he paid for the above-listed coins and the corresponding mental anguish he suffers. Patrick J. White, Charisma Perry, Mike Todd, and Sean Klein committed these substantive RICO offenses by using ALI, AC, and/or PWH to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud—generating exorbitant compensation for themselves. They knew their tactics and marketing practices were misleading and unlawful and would cause Gogoe and numerous other of Defendants' telemarketing customers to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

### COUNT III
### VIOLATION OF 18 U.S.C. § 1962(d) BY
### CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(c)

58.     The preceding factual statements and allegations are incorporated by reference and re-alleged as if fully set forth at length.

59.     ALI, AC, and PWH are each an "enterprise" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d). Patrick J. White, Charisma Perry, Mike Todd, and Sean Klein are "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

60.     Patrick J. White, Charisma Perry, Mike Todd, and Sean Klein conspired with other persons (including, but not limited to, Chirstopher Paradise, Jennifer McGuigan, Joe Cormier, Claire Egan, Melissa Hegstrom, Jay Jensen and possibly other persons, the identities of whom are

only known by Defendants at this stage in the litigation) within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c); that is, they conspired to conduct and/or participate in the business and financial affairs of ALI (RICO Enterprise), AC (RICO Enterprise) and PWH (RICO Enterprise) through a pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(c); 1961(5); and 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341; 1343, set forth above.

61.     The RICO Persons' pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(d) were the causes-in-fact and proximate cause of Gogoe's suffering injury to his business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit: Gogoe was damaged by, inter alia, the fraudulent and inflated prices he paid for the above-listed coins. The RICO Persons, themselves and through their representatives (including, but not limited to, Christopher Paradise, Jennifer McGuigan, Joe Cormier, Claire Egan, Melissa Hegstrom, and Jay Jensen) agreed to commit these substantive RICO offenses by using the RICO Enterprises (ALI, AC, and/or PWH) to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud—generating exorbitant compensation for themselves. They knew their tactics and marketing practices were misleading and unlawful and would cause Gogoe and numerous other of Defendants' telemarketing customers to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their patterns of unlawful activity.

## COUNT IV
## FRAUDULENT INDUCEMENT

62.     All the preceding factual statements and allegations are incorporated by reference and realleged as if set out at length herein.

63.     Defendants, by and through the ALI telemarketing salespersons and representatives, utilized one or more of the above-described unlawful, false, misleading, and unconscionable sales

tactics to fraudulently induce Gogoe into the purchases of the over-priced coins. Specifically, Defendants, by and through their employees and representatives, intentionally and fraudulently induced Gogoe by: misrepresenting material facts which Defendants knew were false at the time they were made with the intent to induce Gogoe into purchasing the coins for the benefit of the Defendants and at the expense of Gogoe; misrepresenting that the price paid for the coins was a current fair value of the coins with full knowledge that the coins were not worth a fraction of the value at which they were sold and purchased; misrepresenting that historically the "investment grade" coins realize significant returns, which they do not; misrepresenting that the "certification" adds a substantial value to the coins when it does not; misrepresenting that it takes at least three to five years for a return on investment of the "investment grade" coins to occur, when such return does not occur; misrepresenting that Gogoe will be able to market his coins for a price similar to Defendants' pricing, which he cannot ethically do; and other misrepresentations that may be exposed during discovery. Defendants, by and through their telemarketing salespersons and representatives, made the above false representations to Gogoe with the intent to induce Gogoe into entering the contracts to purchase the coins. Plaintiff relied upon these misrepresentations to make the initial coin purchases at issue in this case, as well as liquidating his retirement stock portfolio and converting those funds into additional coin purchases from Defendants, resulting in substantial losses at the moment of sale.

     **64.**    Defendants, by and through the ALI telemarketing salespersons and representatives, continued their fraudulent inducement after the original purchases by providing false and misleading sales marketing data to entice Gogoe into buying coins or to "complete" his collection with the intent to induce him into buying more over-priced coins. Defendants made those representations with full knowledge that such representations were false when made with the intent to induce Gogoe to purchase the grossly overvalued coins which, in fact, he purchased to his financial detriment and Defendants' financial gain. As a direct and/or proximate result of

Defendants' false and misleading representations about the overvalued coins, Plaintiff suffered (and continues to suffer) damages in the form of, inter alia, the amounts paid to Defendants for the coins at issue in excess of any reasonable fair market value (plus commercially acceptable markup) and mental anguish damages.

65.     Defendants, by and through the ALI telemarketing salespersons and representatives, committed the tort of fraudulent inducement in their verbal telephonic sales pitches to Gogoe regarding "graded coins," "certified coins," and numismatic coins and through the falsehoods, half-truths, and omissions in their written promotions published inaccurate and false representations of the market values of the coins. Moreover, Defendants' false representations and/or omissions were made knowingly and intentionally or, at the very least, in reckless disregard of Plaintiff's rights and interests.

66.     Because Plaintiff justifiably relied upon Defendants' material misrepresentations and would never have entered into any contracts or agreements with Defendants to purchase the coins at issue absent those misrepresentations, Defendants' wrongful actions constitute fraudulent inducement under New York law.

<u>COUNT V</u>
**FRAUD AND/OR FRAUDULENT CONCEALMENT**

67.     All the preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

68.     Defendants defrauded Plaintiff pursuant to New York common law.  In order to sell the overvalued coins to Gogoe, Defendants utilized one or more of the above-described unlawful, false, misleading and unconscionable high-pressure sales tactics typical of the precious metals/coins/bullion/numismatics direct sales industry. Specifically, Defendants and their telemarketer employees and representatives falsely and/or misleadingly represented to Gogoe that he was a preferred customer, that Gogoe "needed the coins," that Gogoe was "getting a good deal,"

and that Gogoe "would not lose any money" on the purchases. Defendants and their telemarketer employees and representatives also falsely represented the then-current values of the coins with full knowledge that the coins were not worth the value at which they were advertised, sold, and purchased nor will the coins attain the return of investment as promised.

69.     In addition, Defendants are liable for fraudulent concealment against Plaintiff. The elements of fraudulent concealment are identical to the elements for fraud with the addition that the defendant must have a duty to disclose material information and failed to do so.

70.     Defendants had a duty to disclose to Plaintiff based upon their contractual relationship. In addition, or else in the alternative, Defendants had a duty to disclose to Plaintiff based upon the "special facts" doctrine, which provides that a duty to disclose arises when one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair. The "special facts" doctrine is applicable to the present case because the withheld and hidden material information as to the grade, quality, market value, and markups of the coins at issue was "peculiarly within the knowledge" of Defendant, and that the information was not such that could have been discovered by Plaintiff through the exercise of ordinary intelligence.

71.     Defendants, by and through their telemarketer employees and representatives, made the above-detailed false representations to Gogoe with the intent that he would rely upon them and with full knowledge that such representations were false when made. Gogoe relied on Defendants' material and false representations when deciding to purchase the grossly overvalued coins which, in fact, he purchased to his financial detriment and Defendants' obscene financial gain. As a direct and/or proximate result of Defendants' false and misleading representations about the overvalued coins, Gogoe suffered (and continues to suffer) damages in the form of, inter alia, the amounts paid to Defendants for the coins in excess of their fair market values, as well as consequential damages related to the funds he borrowed, liquidated, and/or traded to purchase the coins, and mental anguish damages.

72.     By virtue of the confidential business relationship between Plaintiff and Defendants, Defendants had a duty to disclose the above concealed material facts to Plaintiff.  Their deliberate silence, when they had a duty to speak, and the resulting nondisclosure of the above concealed material facts, is the equivalent of false representations and/or omissions.  Such false representations and/or omissions were made knowingly and intentionally or, at the very least, in reckless disregard of Plaintiff's rights and interests.

73.     Plaintiff justifiably relied on Defendants' false representations and/or omissions to his financial detriment by purchasing the grossly overvalued coins. Defendants' wrongful actions constitute common law fraud.

74.     Defendants concealed their wrongful actions with the intent to mislead and defraud Plaintiff. Plaintiff was not aware of, nor, through the exercise of due diligence, could have become aware of Defendants' wrongful actions until such wrongful actions brought to light by third parties. Due to the Parties' confidential business relationships, which were predicated on their mutual trust and confidence, and Defendants' superior knowledge and/or means of knowledge, Defendants had a duty to disclose to Plaintiff the above materially false information.  Defendants' failure to do so constitutes fraudulent concealment under New York law.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

75.     All the preceding factual statements and allegations are incorporated by reference and realleged as if set out at length herein.

76.     Defendants made certain representations to Plaintiff in the course of their business and in transactions in which Defendants had a substantial monetary interest. Defendants negligently supplied false information that guided Plaintiff, a novice as to precious metals, in his purchase of the grossly overvalued coins.

**77.** Defendants failed to exercise reasonable care and competence in obtaining, confirming the accuracy of, and communicating such information to Plaintiff by, inter alia, utilizing one or more of the above-described unlawful, false, misleading and unconscionable sales tactics typical of the precious metals/coins/bullion/numismatic direct sales industry and/or making the above-described false and material misrepresentations and omissions.

**78.** Gogoe justifiably relied on Defendants' negligent misrepresentations when purchasing the grossly overvalued coins, which directly and/or proximately caused him to suffer damages to the financial benefit of Defendants. Gogoe continued to justifiably rely upon Defendants' negligent misrepresentations in their oral telephonic representations and various print advertisements regarding the grossly overvalued coins, which directly and/or proximately caused him to suffer ruinous damages to the financial benefit of Defendants. Defendants' wrongful conduct constitutes negligent misrepresentation under New York common law.

## COUNT VIII
## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349

**79.** The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

**80.** Defendants' actions described herein constitute deceptive acts and practices in the conduct of business, substantially affecting trade or commerce in New York in violation of the New York Consumer Protection from Deceptive Acts and Practices, Gen. Bus. Law § 349.

**81.** More specifically, Defendants and their telemarketer employees and representatives knowingly and intentionally utilized unlawful, false, misleading, deceptive and unconscionable high-pressure sales tactics to convince Gogoe to purchase the grossly overvalued coins by, inter alia:

    **A.** Enticing customers with false advertising offering to sell precious metal bullion coins at cost or minimum markups, when they do not have sufficient inventory to cover

the advertisement;

**B.**     Misrepresenting or enticing the customer to purchase coins with a "two-year return policy" at no risk to the customer but subsequently stating that all sales were final;

**C.**     Misrepresenting attributes of precious metal coins to move customers from bullion to the over-priced numismatic and semi-numismatic coins;

**D.**     Claiming that the coins were at low "discount" prices due to hardships related to the COVID pandemic when such claims were false and misleading;

**E.**     Claiming that the coins could be held for a short period and then go to auction where they would bring "huge gains";

**F.**     Enticing the customer to buy coins to be sold in a special auction wherein the customers would realize large profits and then subsequently claiming the auction was cancelled;

**G.**     Claiming that coins could be sold to one of Defendants' "elderly clients" for large profits when, in fact, such "elderly clients" were fictitious;

**H.**     Misleading customers to send coins back for trade with assurances that the customers would realize large profits, while Defendants possessed actual knowledge that such trades would, in fact, result in significant losses to the customers;

**I.**     Stalling customers with fraudulent alleged business interruptions such as auctions cancelling, third-party buyers backing out of sales due to alleged estate issues, accounting issues, banking issues, shipping issues, etc.;

**J.**     Confusing the customer by misstating previous representations on trades, returns, values, coins, and various other tactics in an effort to obfuscate the transactions and frustrate the tracking of the transactions;

23

**K.**   Switching coins on orders and justifying it by representing that the coins shipped were of "similar value" when they were not;

**L.**   Guaranteeing significant, immediate profits of 200-300% when such claims are knowingly false and intended to induce and pressure the customer to make a hasty purchasing decision;

**M.**   Advising customers to purchase "unique" bullion coins, when, in fact, there is nothing unique about the coins;

**N.**   Misleading customers to buy or trade for pre-1933 gold coins and representing that by making such purchases or trade the customer would avoid tax issues;

**O.**   Trading or holding-for-trade coins with the promise to sell at a profit, when such inducement was merely intended to stall the customer, obfuscate the transactions, and delay the return of the coins or the purchase price;

**P.**   Providing misleading investment advice by claiming that exchanging bullion for pre-1933 gold coins would provide tax advantages and better short term investment opportunities, when such trade results in significant and immediate loss is value and recovery would take years, if ever;

**Q.**   Using grading and marketing to deceptively sell bullion at a premium as some type of "modern numismatics," even though there are very large populations of the high-grade coins and/or the "certification" is commonly duplicated with minor expense;

**R.**   Misrepresenting the market value of "certified coins" to prevent or delay customers from determining the actual market price of bullion coins;

**S.**   Claiming a volatile market based upon the spot price of gold yet selling bullion coins at such exorbitant and fraudulent prices to make "market price" nothing but a gimmick;

**T.**   Misrepresenting the value of numismatic coins;

24

**U.**     Claiming that the Defendants had shipped coins to the Plaintiff when, in fact, they did not ship all the coins purchased by Plaintiff but intentionally failed to ship the coins and claimed that Plaintiff was mistaken or lying when he inquired as to the missing coins;

**V.**     Pressuring the customer into believing the need to purchase at a purported substantial discount was "immediate" and that the customer had to "act right away" to achieve large profits or else lose a good deal;

**W.**     Misrepresenting that their coins were such a good deal that they were willing to use a "company credit line" to purchase the coins if the customer would cover that credit, while at all times knowing that no credit was involved, that the coins were worth much less than claimed, and that no credit would ever be needed;

**X.**     Misrepresenting to the customer that he had increased his investment by millions of dollars but never forwarding any sums to the customer;

**Y.**     Inducing customers to sign away valuable rights to prevent or discourage customers from pursuing legitimate legal remedies; and,

**Z.**     Various other acts and practices that may be uncovered during discovery.

**82.**     As a direct and proximate result of Defendants' unlawful, unfair, and deceptive acts and practices, Plaintiff has suffered actual damages of over One Million Seven Hundred and Forty-One Thousand ($1,741,000.00).

## <u>COUNT IX</u>
## NEGLIGENCE

**83.**     All the preceding factual statements and allegations are incorporated by reference and realleged as if set out at length herein.

**84.**     Defendants negligently valued, promoted, marketed, advertised, and sold grossly overvalued coins to Plaintiff. This violated and breached Defendants' duty to Plaintiff to exercise

reasonable care in valuing, promoting, marketing, advertising, and selling the coins to Plaintiff. Defendants' wrongful conduct directly and/or proximately caused Gogoe to suffer damages. Defendants' wrongful conduct constitutes common law negligence.

**COUNT X**
**CONSPIRACY**

**85.**     All the preceding factual statements and allegations are incorporated by reference and realleged as if set out at length herein.

**86.**     Defendants (and possibly others), either working together as a combined group or in sub-combinations of two or more, affirmatively conspired to engage in the wrongful actions set forth above.  By doing so, Defendants conspired to accomplish an unlawful purpose or a lawful purpose by an unlawful means.  As such, Defendants conspired to commit the wrongful actions outlined in Counts I-IX, above, all of which directly and proximately caused Plaintiff to sustain actual and consequential damages.  Defendants' wrongful actions constitute common law civil conspiracy.

**COUNT XI**
**MONEY HAD AND RECEIVED**

**87.**     All the preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

**88.**     By their above-described wrongful actions and/or inaction, (1) Defendants received money belonging to Plaintiff, (2) Defendants benefitted from receipt of the money, and (3) under principles of equity and good conscience, Defendants should not be permitted to keep the money. Defendants, therefore, should be compelled to refund such wrongfully charged and collected funds to Plaintiff under the equitable doctrine of money had and received.

## COUNT XII
## UNJUST ENRICHMENT

**89.**    The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

**90.**    Defendants (and possibly other persons and entities, including Defendants' employees and representatives) have been unjustly enriched by (i) being paid an excessive value for coins that are not supported by any reasonable valuation; (ii) using the fraudulently obtained revenues and profits paid by Gogoe, and (iii) generating a return on the amounts described in (i) and (ii).  Accordingly, Gogoe seeks to impose a constructive trust over (and recover) all amounts by which Defendants (and possibly other persons and entities, including Defendants' employees and representatives) have been unjustly enriched.

## COUNT XIII
## ALTER-EGO

**91.**    Alter-ego liability is established upon a showing that a defendant has complete domination of a corporation in respect to the transaction at issue and that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. Because a decision to pierce the corporate veil will necessarily depend on the attendant facts and equities of the case at issue, there are no definitive rules governing the circumstances when this power may be exercised.

**92.**    Based upon information and belief, Patrick J. White, Charisma Perry, Mike Todd, and Sean Klein, individually and collectively, use the corporate form as an alter-ego and as mere tools or business conduits. They completely dominate ALI and AC to shield assets and thus cause a diminution of available resources from which Gogoe may obtain satisfaction of the damages directly and/or proximately caused by Defendants' wrongful conduct. Upon information and belief, there are undocumented funds transfers between the corporation and the Defendants, and there is an unclear allocation of profit and losses between ALI, AC and the Defendants. In short, ALI and AC

are substantially one and the same with Patrick J. White, Charisma Perry, Mike Todd, and Sean Klein, and the relationship between them is an illegitimate use of the corporate form.

**COUNT XIV**
**RESPONDEAT SUPERIOR**

93.     All the preceding factual statements and allegations are incorporated by reference and realleged as if set out at length herein.

94.     Defendants also are liable for the above wrongful acts committed by their employees during the course and scope of their employment by the Defendants; to wit, the employees' and representatives' wrongful conduct was committed (i) within their general authority, (ii) in furtherance of Defendants' business, and (iii) to accomplish the objective for which the employees/representatives were hired (i.e., selling overvalued coins to customers like Plaintiff)—all of which directly and/or proximately caused Plaintiff to suffer damages to the financial benefit of Defendants—and for which Defendants are liable under the doctrine of *respondeat superior*.

**RELIEF REQUESTED**

95.     RECISSION.  Based on Defendants' above-described wrongful conduct, Plaintiff is entitled to recission of the transaction(s) at issue by which Defendants fraudulently marketed the grossly overvalued coins to Gogoe. All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

96.     ACTUAL AND CONSEQUENTIAL DAMAGES.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered (and continues to suffer) damages in the form of, inter alia, the amounts paid to Defendants for the coins in excess of their value. Plaintiff is entitled to recover consequential damages related to lost investments when he was lured into purchasing the coins and the mental anguish he has suffered in connection with these transactions—in an amount to be determined by the trier of fact.  All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

**97.**   AUTOMATIC TREBLE DAMAGES UNDER 18 U.S.C. § 1964(c).   Plaintiff also is entitled to treble damages for Defendants' knowing, willful and intentional wrongful conduct in violation of the RICO statute under 18 U.S.C. § 1964(c).   All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

**98.**   EXEMPLARY DAMAGES.   Defendants' wrongful actions (and failure to disclose such wrongful actions) were committed intentionally, willfully, with malice and/or with conscious and/or reckless disregard for Plaintiff's rights and interests.   Accordingly, Plaintiff also is entitled to an award of punitive damages against Defendants, both as punishment and to discourage such wrongful conduct in the future.

**99.**   ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS.   Plaintiff also is entitled to recover his reasonable and necessary attorneys' fees, litigation expenses and court costs actual damages to be determined by the trier of fact.

**100.**   TRIAL BY JURY.   Plaintiff requests trial by a jury of all legal claims herein.

**WHEREFORE**, Plaintiff requests judgment in his favor and  against the Defendants, jointly and severally, awarding compensatory damages for all actual and consequential losses in an amount to be determined by the Court but equaling or exceeding One Million Seven Hundred and Forty-One Thousand ($1,741,000.00), treble damages under 18 U.S.C. § 1964(c), exemplary damages, and all amounts by which Defendants have been unjustly enriched; directing an equitable accounting for all benefits, consideration and profits received, directly or indirectly, by Defendants, including the imposition of a constructive trust and the voiding of unlawful transfers; and awarding attorneys' fees and litigation expenses pursuant to 18 U.S.C. § 1964(c) and New York G.B.L. § 349(h) and the costs of suit pursuant to 28 U.S.C. § 1920 and Fed. R. Civ. P. 54(d); together with pre-judgment interest pursuant to New York C.P.L.R. § 5004 or any higher applicable rate and post-judgment interest at the highest legal rate, and such other and further relief as the Court deems just, proper, and equitable.

February 6, 2024
Huntington, New York

Respectfully submitted,

Brandon Dei, Esq. (NY Bar: 5840772)
The Law Offices of Brandon Dei, PLLC
*Attorneys for Plaintiffs*
223 Wall Street, Suite 377
Huntington, New York 11743
(202) 444-4222
brndndei@gmail.com
brandon@arbitrationlawgroup.com
davevermont16@gmail.com



## **VERIFICATION**

| | |
|---|---|
| STATE OF MICHIGAN | ) |
| | ) SS: |
| COUNTY OF MECOSTA | ) |

THOMAS A. GOGOE, being duly sworn, hereby states as follows: I am the Plaintiff in this matter. I have read the foregoing Verified Complaint and know the facts thereof to be true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

Dated: February 5 , 2024

*Thomas A Gogoe*
THOMAS A. GOGOE

| | |
|---|---|
| STATE OF MICHIGAN | ) |
| | ) SS: |
| COUNTY OF MECOSTA | ) |

On the 5 day of February 2024, before me, the undersigned, a Notary Public in the above State, personally appeared THOMAS A. GOGOE personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and knowledge to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf which the individual acted executed this instrument.

NOTARY PUBLIC

BRANDON DEI
NOTARY
NO.02DE6417939
QUALIFIED IN
NASSAU COUNTY
COMM. EXP.
05-24-2025
PUBLIC
STATE OF NEW YORK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

THOMAS A. GOGOE,

Plaintiff,      Index No. _____

    - against -

AUSTIN LLOYD, INC.,
AUSTIN COINS, INC.,
P. WHITE HOLDING, LLC,
PATRICK WHITE,
CHARISMA PERRY,
ERIC LESAK a/k/a MIKE TODD,
CHRISTOPHER PARADISE,
and SEAN KLEIN,

**Defendants.**

---

---

### PLAINTIFF'S SUMMONS AND VERIFIED COMPLAINT

---



THE LAW OFFICES OF
**BRANDON DEI**
PLLC

223 Wall Street, Suite 377
Huntington, New York 11743
(202) 444-4222
brndndei@gmail.com
brandon@arbitrationlawgroup.com
davevermont16@gmail.com